## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| HELENE HUTT, individually and on behalf of all others similarly situated, | No. |
| Plaintiff, | |
| -against- | |
| CITY OF MIAMI, a municipal corporation chartered by the State of Florida, | |
| Defendant. | |

## CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND

Plaintiff Helene Hutt ("Plaintiff"), on behalf of herself and all others similarly situated, by her attorneys, hereby alleges the following against defendant, the City of Miami, Florida ("Defendant" or the "City of Miami"), based upon information and belief and upon the investigation by Plaintiff's counsel which included, among other things, a review of the facts and circumstances alleged herein including, without limitation: (a) review and analysis of certain filings made by the City of Miami in connection with issuing its municipal bonds; (b) review and analysis of certain public statements, issuing documents, news articles, and other publications disseminated by or concerning Defendant and related parties; (c) review and analysis of certain audit reports by the Office of Independent Auditor General of the City of Miami; (d) review of the whistleblower complaint filed in *Boudreaux v. City of Miami*; and (e) review and analysis of certain other information, documents, and materials concerning the City of Miami.

Plaintiff believes that further substantial evidentiary support exists for the allegations in this Class Action Complaint and will be available after a reasonable opportunity for discovery.  Many of the facts supporting the allegations contained herein are known only to Defendant or are exclusively within Defendant's custody and/or control.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a securities fraud class action against the City of Miami brought by Plaintiff as a class action on behalf of all persons and entities that purchased or otherwise acquired municipal bonds issued by the City of Miami (the "Class") from September 30, 2005 to November 17, 2009 (the "Class Period").  Defendant defrauded Plaintiff and the other members of the Class by making fraudulent material misrepresentations and omissions regarding the City of Miami's then-current financial condition and future prospects to Plaintiff, other municipal bond purchasers, and the investing public.

2.     Throughout the Class Period the City of Miami represented itself to investors as financially stable and maintaining an internal structure with adequate controls and procedures to ensure proper budgetary accounting and the City of Miami's overall financial stability.  The City of Miami represented to municipal bond investors that the accounting entities responsible for the City of Miami's finances followed Generally Accepted Accounting Principles ("GAAP") as defined by the Governmental Accounting Standards Board ("GASB").  The City of Miami attached audited financial statements to its issuing documents, and maintained that such documents were independently audited by an independent certified public accountant and complied with GAAP.  Indeed, the City of Miami touted its internal controls in the municipal bond

issuing documents, noting that the City of Miami received the Certificate of Achievement for Excellence in Financial Reporting from the Government Finance Officers Association of the United States and Canada.  At all relevant times, however, the City of Miami was improperly and illegally shuffling money between various City of Miami accounts in an effort to cover up its existing fiscal crisis.

3.      Such conduct was not uncharacteristic.  In addition to misrepresenting its finances during the Class Period, the City of Miami is also in violation of a cease and desist order entered by the United States Securities and Exchange Commission ("SEC") on March 21, 2003, in which the SEC concluded that the City of Miami had willfully violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in connection with the offer and sale of municipal bonds occurring prior to the instant Class Period.  As similarly alleged by Plaintiff here, the SEC found that the City of Miami had distributed offering documents and an annual financial report in connection with issuing municipal bonds that misrepresented the City of Miami's financial condition and, as a result, the SEC ordered the City of Miami to cease and desist from committing or causing any violation or future violation of the antifraud provisions of the federal securities laws.  The City of Miami has violated that order.

4.      As alleged more fully below, the full extent of the City of Miami's fiscal problems during the Class Period was revealed only after an independent auditor for the City of Miami reported that the City of Miami had skirted financial integrity rules by using "inaccurate and misleading" budgetary practices in an effort to fill budget holes. The auditor further reported that the City of Miami failed to comply with four of thirteen standards governing its budgeting during the fiscal year ended September 30, 2008, and

identified $8.2 million of highly restrictive money used to balance its books the previous year.

5.      Shortly thereafter, the SEC again began investigating the City of Miami's major bond offerings, this time between the years 2006 and 2009.  The SEC is questioning the City of Miami's financial transfers used to balance the budget – transfers that helped the City of Miami artificially balance its books as expenses and pension and salary costs escalated.  Thus, the SEC requested information relating to the manner in which the City of Miami was moving money around to shore up its bottom line as well as how it represented its overall financial picture to municipal bond holders.

6.      Identical to the previous SEC inquiry that resulted in the 2003 cease and desist order, the current SEC inquiry is focused on whether the City of Miami properly disclosed its financial problems to bond holders, which involves at least $250 million in municipal bond deals for major projects since 2006.

7.      On this news, the City of Miami began taking a closer look at its budget concerns.   It fired the City of Miami's Budget Director Michael Boudreaux ("Boudreaux"), and its Chief Financial Officer Pedro G. Hernandez ("Hernandez") resigned.  A once reportedly ample $141 million reserve is in reality expected to dwindle to $55 million by the end of this year, and eventually completely deteriorate due to expenses of which the City of Miami was aware at all relevant times during the Class Period but did not accurately disclose, harming Plaintiff and the other members of the Class.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action because the claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

10.     The Court has personal jurisdiction over Defendant.  In connection with the acts and omissions alleged in this Complaint, Defendant, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, interstate telephone communications, the mails and wires, and the facilities of the national securities exchanges.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa.  Many of the acts and transactions constituting the violations of law complained of herein, including the dissemination to the public of materially false and misleading statements, occurred in this District.  In addition, the City of Miami is located in this Judicial District.

## THE PARTIES

12.     Plaintiff, Helene Hutt, purchased municipal bonds during the Class Period and sustained significant losses as a direct result of Defendant's fraudulent conduct alleged herein.   Plaintiff's executed certification authorizing her participation in this

action is attached hereto as mandated by the Section 21D(a)(2)(A) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a).

13.     Defendant, the City of Miami, is a political subdivision of the State of Florida and is a local government authority as that term is defined in Florida Statute 112.3187.  Its executive offices are located at City Hall, 3500 Pan American Drive, Miami, Florida  33133.

14.     During the Class Period, Defendant, through its executive officers and/or directors, was privy to non-public information concerning its budget and finances, via access to internal corporate documents, conversations, and connections with other governmental officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, Defendant knew or recklessly disregarded that its adverse financial condition specified herein had not been disclosed to, and was being concealed from, the investing public.

15.     Defendant, through its agents, participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained within and omissions therefrom, and were aware of their materially false and misleading nature.  Defendant had access to the adverse undisclosed information about its financial condition as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations, made by or about the City of Miami and its finances, materially false and misleading.

16.     Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of municipal bonds by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding the City of Miami's budget, operations and management and the intrinsic value of the City of Miami's municipal bonds; and (ii) caused Plaintiff and other members of the Class to purchase the municipal bonds at artificially inflated prices.  When the truth was revealed, the price of the municipal bonds dropped, thereby damaging Plaintiff and other members of the Class.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class of all persons who purchased or otherwise acquired municipal bonds from the City of Miami during the Class Period and who were damaged thereby.  Excluded from the Class are Defendant, its agents and governmental officers and directors, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendant has or had, during the Class Period, a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the City of Miami's municipal bonds were actively traded.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the City of

Miami or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of federal law that is complained of herein.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class include:

a.     whether the federal securities laws were violated by Defendant's acts as alleged herein;

b.     whether statements made by Defendant to the investing public during the Class Period misrepresented material facts about the budget, finances, operations, future prospects and fiscal management of the City of Miami; and

c.     the extent to which members of the Class have sustained damages and the proper measure of damages.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for members

of the Class to individually redress the wrongs done to them.  There will be no difficulty in managing this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The City of Miami's Prior Violations of the Federal Securities Laws

23.     In 1996, the City of Miami's fiscal operations were taken over by the State of Florida's Financial Emergency Oversight Board and its bond rating was cut to high-risk, high-yield "junk" by S&P when unsound budget practices created a $68 million budget deficit.

24.     Specifically, the City of Miami attempted to hide deficits for several years by borrowing money from City of Miami funds that contained nonrecurring sources to satisfy operating expenses.  The City of Miami is required by Florida law to submit annual budget reports, and in preparing these reports the City of Miami repeatedly used these interagency transfers to mask its massive deficit and to make its budget appear balanced.

25.     During this time, the City of Miami publicly disseminated financial statements showing the City of Miami's budget to be balanced, and hiding its known, massive deficits.  The City of Miami then approved three bond issues which relied upon these financial statements, to the investors' detriment.

26.     As a result, In 2001, an administrative law judge held that the City of Miami mislead investors, creating the appearance of a balanced budget by using money from separate accounts to fill known deficiencies in the City of Miami's general fund.

27.     Indeed, the SEC conducted an investigation which demonstrated that over a six year period, City of Miami officials repeatedly borrowed money from capital funds

to keep the budget balanced; transfers not clearly disclosed to investors or the public. The SEC also determined that the City of Miami's ongoing financial problems were well known to City of Miami officials, despite the fact that the financial problems were hidden from investors and the public.

28.     The SEC cited the City of Miami for fraud in the offer and sale of securities, finding that it violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.  Among other things, the SEC determined that the City of Miami failed to disclose its true financial condition in documents for three 1995 bond sales, which culminated in a cease and desist order prohibiting the City of Miami from "committing or causing any violation or future violation of the antifraud provisions of the federal securities laws."

29.     In addition to the SEC cease and desist order, the City of Miami passed the Financial Integrity Ordinance to appease the State of Florida's Financial Emergency Oversight Board, which was to have "continuous existence until three years after the City of Miami has produced two successive years of balanced operations and none of the statutory conditions for determining a local government financial emergency exists."  The Financial Integrity Ordinance requires the City of Miami to keep approximately 20 percent of its annual property tax receipts untouched in a general fund for emergencies.

30.     The City of Miami regained its investment-grade rating in 2001, when S&P raised its grade four levels to BBB+ from BB.  It was boosted three more steps, to A+ in 2004.  Thereafter, the municipal bonds at issue in the present case were issued by the City of Miami and sold to investors such as Plaintiff and the Class.

**The City of Miami's Current Governmental Structure**

31.     Following the City of Miami's SEC violations in 1996, and since 1997, the City of Miami has been governed by a form of government known as the "Mayor-Commissioner Plan" comprised of the Mayor and the City Commission.

32.     The City Commission, the legislative body of the City of Miami, is comprised of five Commissioners elected from designated districts within the City of Miami (the "Commission").  The Commission adopts resolutions which authorize the sale of municipal bonds for various projects the City of Miami wants to complete.

33.     The Mayor, elected at large every four years, is the official head of the City of Miami and has veto authority over actions of the Commission.  At all times relevant to this complaint, the Mayor of the City of Miami was former Mayor Manny Diaz ("Former Mayor Diaz"), who signed off on all of the City of Miami's bond offerings during the Class Period.

34.     The Mayor appoints the City Manager who functions as chief administrative officer responsible for all City of Miami departments and supervision of all City of Miami employees.  The City Manager retains full authority to appoint and supervise department directors, including the City of Miami's Chief Financial Officer, Budget Director, and Finance Director, and is responsible for preparation of the City of Miami's annual budget.  At all times relevant to this dispute, Hernandez was the City Manager, the City of Miami's Chief Financial Officer was Larry Spring ("Spring"), and the Finance Director was Diana Gomez ("Gomez").  The City Treasurer was Pete Chricut ("Chricut"), and Boudreaux was the City of Miami's Budget Director at all relevant times during the Class Period.

35.     Boudreaux took over budgeting for the City of Miami on June 13, 2005, and was fired on March 8, 2010, for, as explained more fully below, the series of questionable multi-million dollar transfers which propped up the City of Miami's budget but are now central to the currently ongoing SEC investigation.

36.     Hernandez resigned in February of 2010.

37.     Former Mayor Diaz's term expired in November 2009.  He was replaced by current Mayor Tomas Regalado ("Mayor Regalado").

**The City of Miami's False and Misleading Statements**

38.     The City of Miami is currently facing a financial crisis and SEC probe that Mayor Regalado has labeled "déjà-vu 1996."

39.     Once again, the City of Miami has misrepresented a financial crisis to its bond investors by transferring funds between capital projects and the City of Miami's general fund to artificially balance the City of Miami's budget and misrepresent the City of Miami's dismal fiscal reality to municipal bond investors.

40.      In the issuing documents for each of the municipal bond issues during the Class Period, the City of Miami attached the then-current fiscal year budget as well as the proposed fiscal year budget for the following year.  The City of Miami represented each budget to be balanced at all relevant times during the Class Period.

41.     Each of the issuing documents also incorporated a Comprehensive Annual Financial Report which, as stated in letters from Hernandez, Spring, and Gomez to the Mayor, "consisted of management's representations concerning the finances of the City." As further stated in the letters to the Mayor:

> [M]anagement assumes full responsibility for the completeness and reliability of all the information presented in this report.  To provide a

reasonable basis for making these representations, management of the City has established a comprehensive internal control framework that is designed both to protect the City's assets from loss, theft or misuse and to compile sufficient reliable information for preparation of the City's financial statements in conformity with accounting principles generally accepted in the United States of America (GAAP)….As management, we assert that, to the best of our knowledge and belief, this financial report is complete and reliable in all material respects.

42.    The City of Miami further represented that independent, licensed public accountants had audited the City of Miami's financial statements, and:

[The] goal of the independent audit was to provide reasonable assurance that the financial statements of the City…are free of material misstatement….The independent auditors concluded, based upon the audit, that there was reasonable basis for rendering an unqualified opinion that the City's basic financial statements…were presented fairly in conformity with GAAP.

43.    The City of Miami even touted the supposed transparency of its financial reporting and compliance with GAAP in its issuing documents by referencing its Certificate of Achievement for Excellence in Financial Reporting awarded by the Government of Finance Officers Association of the United States and Canada ("GFOA"), obtained in previous years.

44.    Hernandez, Spring, and Gomez represented that in order to obtain the Certificate of Achievement, the Comprehensive Annual Financial Report was evaluated by an impartial Special Review Committee composed of other government officers, independent certified public accountants, educators, and others with particular expertise in government accounting and financial reporting.  They further represented that each consecutive year's Comprehensive Annual Financial Report continued to conform to the high standards of the Certificate of Achievement Program, and that the City of Miami would continue to submit them to the GFOA for consideration.

45.     In each of the Comprehensive Annual Financial Reports the City of Miami represented that its assets exceeded its liabilities at the close of the most recent fiscal year.

46.     In each of the Comprehensive Annual Financial Reports the City of Miami represented that the governmental activities revenue increased, thereby increasing the City of Miami's net assets.

47.     In each of the Comprehensive Annual Financial Reports the City of Miami represented that the General Fund (the City of Miami's primary operating fund) reflected an increase in fund balance at the close of the most recent fiscal year.

48.     In each of the Comprehensive Annual Financial Reports the City of Miami represented that the City of Miami's total debt for bonds and loans decreased, and no new debt was issued.

49.     The City of Miami uses a GASB 34 model to report its financial statements. Under the GASB 34 model (originally implemented by the City of Miami in 2001/2002) the focus is on the City of Miami as a whole (the government-wide aspect of the model) as well as the finances of each of the City of Miami's major individual funds (the fund financial statements).

50.     Using the GASB 34 model, the City of Miami repeatedly reported during the Class Period that both the City of Miami's overall budget, as well as the budget of each of the City of Miami's major individual funds, was balanced and that the City of Miami was not only financially stable, but prospering.

**The Truth Begins to Unfold**

51.     On October 1, 2009, The Miami Herald reported that City of Miami officials had confirmed that the City had violated its own Financial Integrity Ordinance by borrowing at least $20 million from the City's emergency reserve fund in order to balance the 2009 budget.  The reserve, which was $141 million in 2003, is expected to drop to $55 million.  The Financial Integrity Ordinance passed at the helm of the last SEC probe requires the City of Miami to have approximately $90 million in its fund in 2009.  Thus, the City of Miami is currently in violation of its own Ordinance.

52.     Specifically, it was reported that in 2007 and 2008, Boudreaux transferred $26.4 million from capital projects to help balance the budget – transfers now at the heart of the SEC inquiry over whether Miami misled investors about its financial picture. Spring, Hernandez and Gomez were aware that Boudreaux made the transfers and indeed signed off on them.  The Commission eventually voted to approve the $26.4 million in transfers as well.  Each have been subpoenaed by the SEC.

53.     On November 17, 2009, City of Miami auditor Victor I. Igwe of the City of Miami's Office of Independent Auditor General, issued an audit report formally stating that the City Of Miami had skirted financial integrity rules by using "inaccurate and misleading" budgetary practices in an effort to fill budget holes.  The City of Miami failed to comply with four of 13 standards governing its budgeting during the fiscal year ended September 30, 2008.  The report identified $8.2 million of highly restrictive money used to balance its books the previous year.

54.     Following this report, on December 11, 2009, the SEC sent the City of Miami a letter probing the City of Miami's major bond offerings between 2006 and 2009

and questioning the City of Miami's financial transfers used to balance the budget. These transfers helped the City of Miami balance its books as expenses rose faster than expected amid skyrocketing pension and salary costs. The SEC therefore requested information relating to the manner in which the City of Miami was moving money around to shore up its bottom line as well as how it represented its overall financial picture to bond holders.

55.     Specifically, the SEC requested all documentation between the City of Miami and the financial institutions that the City of Miami dealt with in its bond offerings between 2006 and 2009, including First Southwest Company, Merrill Lynch Pierce, Fenner & Smith, UBS Securities, and J.P. Morgan Securities.

56.     The SEC has also demanded documentation between the City of Miami and McGladrey & Pullen, the accounting firm that prepares the City of Miami's Comprehensive Annual Financial Reports. Identical to the SEC's prior inquiry and resulting cease and desist order, the current SEC inquiry is again focused on whether the City of Miami properly disclosed its financial problems to bond holders, which involves at least $250 million in municipal bond deals for major projects since 2006.

57.     Indeed, the City of Miami has again participated in a financial shell game to illegally hide deficits to help the budget appear flush and maintain its S&P ratings. These deficits are reportedly the result of exponentially rising pension costs of which the City of Miami was at all times aware and which obviously could never be met.

58.     To balance last year's budget, the City of Miami had to pay almost $60 million to the pension plan. This year the cost is expected to escalate to $101 million. These are costs the City of Miami knew about prior to releasing its financial statements,

and that the City of Miami misrepresented in its budget to the detriment of municipal bond investors.  Indeed, the pension costs are so debilitating, that since this fiscal crisis has been unearthed, current City Manager Carlos Migoya has put a halt to capital projects using general fund money, and ordered the City of Miami to stop procurement for three months.  Mayor Regalado has considering selling city-owned property to replenish the reserve fund.

59.     County Commissioner Carlos Giminez, who was the City Manager when its reserves peaked in 2003, has labeled the City of Miami's misrepresentations "unbelievable" and publicly stated, "They forgot the lessons of the past."

60.     Hernandez resigned in February of 2010.

61.     Boudreaux was fired in March of 2010.   Mayor Regalado called Boudreaux's dismissal "an important step, and the right message….We need to show we cleaned the house."

62.     On April 26, 2010, Boudreaux filed a complaint against the City of Miami for violations of Florida's Whistleblower Act.  Boudreaux confirms that during fiscal years 2007-2008 and 2008-2009, the City discovered that it had major budget shortfalls due to decisions that had been made by Former Mayor Diaz, the Commission, Hernandez, Spring, and Gomez.  Boudreaux acknowledges the shell game the City of Miami played to take funds already allocated to capital projects and transfer those funds to the general ledger.  Boudreaux alleges in his lawsuit that he was directed by his superiors to "fill the shortfall," and that Former Mayor Diaz and Hernandez, Spring, and Gomez were all "fully briefed" on the transfers of unspent capital funds and made the decision to transfer those funds to the general fund.

63.    Specifically, Boudreaux alleges that Former Mayor Diaz, Hernandez, Spring, Gomez and Chricut were aware of $13.1 million unspent capital funds in fiscal year 2007-2008, and $13.14 million unspent capital funds in fiscal year 2008-2009 used to fill the gap in the general fund.   Boudreaux alleges that Former Mayor Diaz, Hernandez, Spring, Gomez and Chricut failed to take steps to adjust the ledgers on the capital projects once the transfers to the general fund were made, and failed "to make sure that the SEC and any potential purchasers of bonds and/or bond-rating agencies were aware of the truth regarding the City's financial crisis, the budget shortfall, and how the shortfall was being filled."  Boudreaux details, for instance, how Gomez failed to make needed adjustments to the journal entries in the City's Oracle computer system to reflect that the funds had been transferred out of the capital projects.  As a result, the capital projects spent the funds that had been transferred to the General Fund.  Boudreaux claims that he was fired after he informed Mayor Regalado, Hernandez, Spring, Gomez and Chricut of his intention to cooperate with the SEC, FBI and other investigating authorities.

## ADDITIONAL SCIENTER ALLEGATIONS

64.    As alleged herein, Defendant acted with scienter in that Defendant knew that the public documents and statements issued or disseminated by or in its name were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  Defendant, by virtue of its receipt of information reflecting the true facts regarding its finances, its

control over the materially misleading misstatements, and/or its associations with entities which made it privy to confidential information concerning the City of Miami's finances, were active and culpable participants in the fraudulent scheme alleged herein.  Defendant knew of and/or recklessly disregarded the false and misleading nature of the information which it caused to be disseminated to the investing public.  The true state of the City of Miami's financial condition and operations was not and could not have been unknown to the personnel at the highest level of the City of Miami's government at the time it disseminated each of its issuing documents for the municipal bond issues.

65.     Defendant was motivated to materially misrepresent to investors the true financial condition of the Company because the scheme: (i) deceived the investing public regarding the City of Miami's operations, management, and overall finances, and allowed Defendant to artificially balance the budget; (ii) enabled Defendant to issue hundreds of millions of dollars in municipal bonds to generate cash flow for projects the City of Miami wanted to undertake; and (iii) caused Plaintiff and other members of the Class to purchase the municipal bonds at artificially-inflated prices.

## CAUSATION AND ECONOMIC LOSS

66.     As described herein, during the Class Period, Defendant made or caused to be made a series of materially false or misleading statements about the City of Miami's overall fiscal condition, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the City of Miami and its financial, investment and operating condition, results, prospects and operations, thus causing the City of Miami's municipal bonds to be overvalued and artificially inflated at all relevant times.  Defendant's materially false and

misleading statements during the Class Period were widely disseminated to the securities markets, investment analysts and to the investing public, and resulted in Plaintiff and other members of the Class purchasing the City of Miami's municipal bonds at artificially inflated prices. Moreover, upon the revelation to the market and the investing public of the truth concerning the City of Miami's operations and fiscal reality, the market price of the municipal bonds declined substantially, resulting in significant damages to Plaintiff and other members of the Class.

67. Had the truth about the City of Miami's finances been revealed to the market earlier, Plaintiff and the Class would not have purchased the City of Miami's municipal bonds or would have purchased the municipal bonds at lower prices and with a higher interest rate of return.

68. Defendant's conduct, as alleged herein, proximately caused foreseeable losses to Plaintiff and the other members of the Class.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

69. The market for the City of Miami's municipal bonds was open, well-developed and efficient at all relevant times for the following reasons (among others):

    a.    The City of Miami's municipal bonds were actively traded;

    b.    The City of Miami regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

c.      The market reacted to public information disseminated by the City of Miami;

d.      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the City of Miami's municipal bonds; and

e.      Without knowledge of the misrepresented or omitted material facts, Plaintiff and the other members of the Class purchased or otherwise acquired the City of Miami's municipal bonds between the time Defendant made the material misrepresentations and omissions, during which time the price of the municipal bonds were inflated by Defendant's misrepresentations and omissions.

70.      As a result of the foregoing, the market for the City of Miami's municipal bonds promptly digested current information regarding the City of Miami's finances from all publicly available sources, and reflected such information in the City of Miami's municipal bond prices.  In ignorance of the true financial condition of the City of Miami, Plaintiff and other members of the Class, relying on the integrity of the market, and/or the statements and reports of the City of Miami containing the misleading information, purchased or otherwise acquired the municipal bonds at artificially inflated prices during the Class Period.  Under these circumstances, all purchasers and acquirers of the City of Miami's municipal bonds during the Class Period suffered similar injury through their purchase or acquisition of the City of Miami's municipal bonds at artificially inflated prices and a presumption of reliance applies.

## THE STATUTORY SAFE HARBOR FOR
## FORWARD-LOOKING STATEMENTS IS INAPPLICABLE

71.    The statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendant is liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the City of Miami who knew that those statements were false when made.

72.    The statutory safe harbor providing for forward-looking statements under certain circumstances, moreover, does not apply to false statements or material omissions of existing facts.

## COUNT I

## Violation of Section 10(b) of the Exchange Act and
## SEC Rule 10b-5 Promulgated Thereunder

73.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.     This Count is asserted by Plaintiff on behalf of herself and the Class against Defendant and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

75.     During the Class Period, Defendant carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflated and maintained the market price of the City of Miami's municipal bonds; and (iii) caused Plaintiff and other members of the Class to purchase or otherwise acquire the City of Miami's municipal bonds at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendant took the actions set forth herein.

76.     Defendant, by use of means or instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers and acquirers of the City of Miami's municipal bonds in an effort to maintain artificially high market prices for the City of Miami's municipal bonds in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

77.     As a result of its making and/or substantial participation in the creation of affirmative statements and reports to the investing public, Defendant had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC

Regulation S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the City of Miami's operations and performance so that the market prices of the City of Miami's publicly traded municipal bonds would be based on truthful, complete and accurate information.  Defendant's material misrepresentations and omissions as set forth herein violated that duty.

78.     Defendant engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class.  Defendant knowingly caused its reports and statements to contain misstatements and omissions of material fact as alleged herein.

79.     As a result of Defendant's fraudulent activity, the market price of the City of Miami's municipal bonds was artificially inflated during the Class Period.

80.     In ignorance of the true financial condition of the City of Miami, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of the City of Miami containing the misleading information, purchased or otherwise acquired the City of Miami's municipal bonds at artificially inflated prices during the Class Period.

81.     The market price of the City of Miami's municipal bonds declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

82.     Plaintiff's (and the Class') losses were proximately caused by Defendant's active and primary participation in the scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the City of Miami's finances.  Plaintiff (and the members of the

Class) purchased the City of Miami's municipal bonds in reliance on the integrity of the market price of those bonds, and Defendant manipulated the price of the City of Miami's municipal bonds through their misconduct as described herein.  Plaintiff's (and the Class') losses were a direct and foreseeable consequence of Defendant's concealment of, among other things, the true state of the business operations, growth prospects and financial condition of the City of Miami.

83.     Throughout the Class Period, Defendant was aware of material non-public information concerning the City of Miami's fraudulent conduct (including the false and misleading statements described herein).  Throughout the Class Period, Defendant willfully and knowingly concealed this adverse information and Plaintiff's (and the Class') losses were the foreseeable consequence of Defendant's concealment of this information.

84.     As a direct and proximate cause of the Defendant's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of the City of Miami's municipal bonds during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against Defendant for all damages sustained as a result of the Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  May 4, 2010                         **FARUQI & FARUQI, LLP**


                                            By: _____/s/ Emily C. Komlossy_____
                                            Emily C. Komlossy (FL Bar No. 7714)
                                            ekomlossy@faruqilaw.com
                                            3595 Sheridan Street, Suite 206
                                            Hollywood, Florida 33021
                                            Tel: 954-239-0280
                                            Fax: 954-239-0281

                                            **GARDY & NOTIS, LLP**
                                            Mark C. Gardy
                                            mgardy@gardylaw.com
                                            James S. Notis
                                            jnotis@gardylaw.com
                                            Kelly A. Noto
                                            knoto@gardylaw.com
                                            560 Sylvan Avenue
                                            Englewood Cliffs, New Jersey 07632
                                            Tel: 201-567-7377
                                            Fax: 201-567-7337

                                            **SADIS & GOLDBERG LLP**
                                            Douglas R. Hirsch
                                            dhirsch@sglawyers.com
                                            Charles H. Dufresne
                                            cdufresne@sglawyers.com
                                            551 Fifth Avenue, 21st Floor
                                            New York, New York 10176
                                            Tel: 212-573-6660
                                            Fax: 212-573-6661

                                            *Counsel for Plaintiff*